IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Russell R. Gibson, | ) | Civil Action No. 6:14-4772-MGL-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on May 24, 2012, alleging that he became unable to work on March 8, 2012.[2]   The applications were denied initially and on

---

[1]  A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2]  The plaintiff filed previous applications for DIB and SSI on June 15, 2010, and proceeded to a hearing before the same ALJ as in the instant case, who issued a decision on March 7, 2012, finding that the plaintiff was not disabled (Tr. 125-43).  The plaintiff did

reconsideration by the Social Security Administration.  On February 27, 2013, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and Pedro M. Roman, an impartial vocational expert appeared on April 8, 2014, considered the case *de novo*, and on April 29, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 22-38).

The plaintiff requested a review of the decision by the Appeals Council (Tr. 17-18).  The Appeals Council granted the request for review and issued an unfavorable decision on October 23, 2014 (Tr. 1-7), thereby making the Appeals Council's decision the final decision of the Commissioner of Social Security.  The Appeals Council stated that it had reviewed the third-party statement of the plaintiff's aunt, Nellie Lawless, which was not evaluated in the ALJ's hearing decision.  The Appeals Council gave the statement little weight because it was based on the plaintiff's subjective complaints and did not indicate the degree to which the plaintiff's ability to lift, reach, walk, stand, or sit was limited (Tr. 4-7; *see* Tr. 331-39).  The Appeals Council adopted the ALJ's findings that the plaintiff was not disabled (Tr. 6).  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the Appeals Council[3]:

> (1)    The claimant has not engaged in substantial gainful activity since his alleged onset date of March 8, 2012.
>
> (2)    The claimant has the following severe impairments: lumbar degenerative disc disease, bilateral carpal tunnel syndrome, depression, anxiety and a bipolar disorder, but does not have an impairment or combination of impairments which

---

not appeal that decision, but filed a new claim alleging an onset date of disability of March 8, 2012 (Tr. 22).

[3]  The Appeals Council's decision is the final decision of the Commissioner (Tr. 1).  The Appeals Council adopted the ALJ's findings or conclusions regarding whether the plaintiff is disabled (Tr. 5), but stated its findings slightly differently than the ALJ (Tr. 6; *see* Tr. 24-38).

is listed in, or which is medically equal to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(3)    The claimant's combination of impairments results in the following limitations on his ability to perform work-related activities:  the claimant retains the ability to perform light work as defined by applicable Social Security regulations, provided that (1) the claimant needs to alternate sitting and standing throughout the work day as defined by the vocational expert (i.e., standing and walking approximately four to six hours with the ability to have a stool for sitting from a little to two hours), (2) the claimant has no ability to climb ladders, ropes or scaffolds, (3) the claimant has the ability to balance, stoop, kneel, crouch and crawl occasionally, (4) the claimant is limited to frequent gross and fine manipulation, (5) the claimant is limited to simple, routine repetitive tasks with no ongoing public contact, and (6) the claimant is limited to a low stress work environment, defined as involving only occasional changes in the work setting or occasional decision making.

(4)    The claimant has not been able to perform any past relevant work since March 8, 2012.

(5)    The limitations on the claimant's ability to perform work-related activities set forth in Finding 3 do not preclude the performance of jobs that exist in significant numbers in the national economy.

(6)    The claimant has not been disabled as defined in the Social Security Act at any time during the period from March 8, 2012 through the date of the Administrative Law Judge's decision on April 29, 2014.

(Tr. 6).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

3

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments

which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on February 11, 1975, and was 37 years old as of his alleged disability onset date (Tr. 102). He completed the twelfth grade in 1993 (Tr. 276). He worked as an auto technician for a few years, but stopped when he developed carpal tunnel syndrome and underwent surgery in 1999, which gave him some relief (Tr. 427). He worked as a sheet metal fabricator from 1997 to 2005. This involved lifting up to 100

pounds occasionally and 50 pounds frequently (Tr. 342). Also in 2005, he worked in production as a machine operator, unloading finished product from machinery, which involved lifting 25 pounds (Tr. 341). In 2006, he was a cloth doffer in a textile mill, which involved lifting 50 pounds occasionally and 25 pounds frequently (*id*.). From 2007 to 2008, he made concrete forms for a concrete company; this required lifting 50 pounds occasionally and 20 pounds frequently (Tr. 342).

***Medical Evidence***

On April 13, 2011, the plaintiff saw his primary care physician, Jaymi S. Meyers, M.D., at Keowee Family Medicine. The plaintiff had mild tenderness in the lumbar region, but no point tenderness (Tr. 377). Dr. Meyers recommended that the plaintiff stretch every morning for his lumbago and encouraged him to lose weight (*id*.). Dr. Meyers prescribed medication (Clonazepam and Paxil) for anxiety and insomnia (Tr. 376). The plaintiff reported that he had not had any more panic attacks since his last visit, that he was going to court regarding child support and needed a form filled out, and that he could not find work (Tr. 376-77).

On June 7, 2011, Dr. Meyers noted that the purpose of the plaintiff's visit was "paperwork" (Tr. 374). Dr. Meyers prescribed Neurontin for back pain and noted that the plaintiff's lawyer had advised him to get an MRI of his entire back, which Dr. Meyers declined to do because the plaintiff had recently had an MRI of his lumbar spine (Tr. 374-75).

During an appointment on August 2, 2011, Dr. Meyers noted that the plaintiff had received a summons from family court (Tr. 371). Dr. Meyers wrote a note for the plaintiff indicating that he was not currently able to work, had trouble caring for himself, and was awaiting formal psychiatric evaluation (Tr. 373).

On January 18, 2012, Dr. Meyers observed that the plaintiff was stable on his medication without visible anxiety (Tr. 367). The plaintiff reported that he was doing "OK"

and tried to spend time with his son, age 12 (Tr. 366). At the next appointment on April 16, 2012, Dr. Meyers noted that the plaintiff was "overall still doing really well" and encouraged him to participate in daily physical activity and to stop smoking (Tr. 365).

Also in April 2012, the plaintiff was referred to John Martin, M.D., at the Pain Management Center at Oconee Medical Center ("OMC") for pain management and physical therapy. The plaintiff was treated by Dr. Martin until September, 2013. During the plaintiff's initial examination on April 25, 2012, Dr. Martin noted that the plaintiff had a history of pain issues, with back pain being reported by the plaintiff as far back at 1993. Dr. Martin noted that a May 19, 2011, MRI showed "mild broad-based central disk bulging at L4-L5 and L5-S1 levels" and also noted that the plaintiff has "bilateral prominence for the scapulae medially." There was no gross neuroforaminal or central spinal canal stenosis evident on the MRI (Tr. 384). Dr. Martin found no palpable muscle spasm along the lumbar spine. The plaintiff said he took a Lortab occasionally that he got from relatives and no other pain medication. The plaintiff complained of an aching in his hands and shoulder blades, and reported that past carpal tunnel surgery several years ago helped with the tingling in his hands. The plaintiff maintained that his primary problem over the past years had been depression and anxiety, that he lost his job because of marital problems, and had not felt well since his wife left him (*id*.).

During the April 25th examination, Dr. Martin noted exaggerated moaning and groaning as the plaintiff moved from a standing position to a seated position to a standing position (Tr. 385). Dr. Martin observed that the plaintiff had an excellent range of motion of both shoulders with no tenderness to palpation over the scapulae. His grip strength was satisfactory; his muscle strength in all major motor groups was 5/5 bilaterally, and he had full range of motion of his elbows, wrists, and fingers. Dr. Martin observed no edema or atrophy in the plaintiff's lower extremities. The plaintiff was pain-free on internal/external rotation of his hips, and his test of straight-leg raising was negative for radicular symptoms.

7

The muscle strength of the major groups in his legs was 5/5.  He had adequate and symmetrical dorsiflexion strength in both great toes and no sensory deficits.  Dr. Martin prescribed Soma for lumbar muscle spasm and myofascial pain, and recommended physical therapy.  Dr. Martin diagnosed the plaintiff with lumbago and myofascial pain as well, and prescribed Mobic 15 mg and Soma 350 mg.(Tr. 384-85).

On May 3, 2012, the plaintiff was seen at the Anderson-Oconee-Pickens Mental Health Center for anxiety, problems sleeping, and mood swings (Tr. 354-56).  He reported to David Stevenson, M.D., that he was currently divorced, lived alone, and was seeking treatment and medication for his symptoms of racing thoughts, mood swings, panic attacks, and problems sleeping.  The plaintiff told Dr. Stevenson that he had been treated for several years by his primary care physician with Paxil and Klonopin.  Dr. Meyers referred the plaintiff for a psychological evaluation after the plaintiff, who was adopted, reported that he had recently met his biological mother, who told him that she was "bipolar" (*id.*).  He was assigned a Global Assessment of Functioning ("GAF") score of 50 (Tr. 356).[4]

An initial evaluation at the OMC physical therapy department on May 8, 2012, indicated that the plaintiff demonstrated a normal speed of gait despite leg length discrepancy and midline tenderness at the L1-L5 level on palpation (Tr. 441-42). Dorothy Dillon, the plaintiff's physical therapist, completed a form on June 18, 2012.  Ms. Dillon opined that the plaintiff is only able to sit for 15 minutes at a time and for three to four hours in a regular eight hour workday.  She opined that he is able to stand/walk for only ten minutes at a time and two hours during the workday (Tr. 357).  Ms. Dillon indicated that the

---

[4]  A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning."  *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.* A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.*

plaintiff could occasionally lift less than ten pounds, could grasp, turn, and twist objects 90 percent of the workday with either hand, and use his fingers for fine manipulation with either hand 90 percent of the workday (Tr. 358). Ms. Dillon indicated that the plaintiff's grip strength was 70 pounds with his right hand and 62 pounds with his left hand (*id*.) She estimated that the plaintiff would be absent from work for treatment or impairment more than four times a month (*id*.).

On June 27, 2012, Dr. Myers described the plaintiff as alert, pleasant, and cooperative, with normal cognition (Tr. 363).

The plaintiff was discharged from physical therapy on July 6, 2012 (Tr. 432). He showed improvement in trunk forward flexibility and hamstring flexibility and was encouraged to continue a home program of exercise independently and to obtain an addition to the bottom of his shoe to correct a right leg discrepancy of 1.5 inches (*id*.).

On July 12, 2012, Abdalla M. Bamashmus, M.D., performed a psychiatric evaluation on the plaintiff at the office of Anderson Neuropsychiatry Associates (Tr. 391-93). Dr. Bamashmus observed that the plaintiff was alert and oriented, with an irritable affect (Tr. 392). Dr. Bamashmus found that the plaintiff's thought processes were logical and goal-directed and his memory was mildly impaired (Tr. 391). The plaintiff's attention and concentration were fair. Dr. Bamashmus found no psychosis; he tentatively diagnosed "rule-out bipolar disorder," "rule-out borderline personality traits v. disorder," and "rule-out intermittent explosive disorder," continued the plaintiff's Klonopin and Paxil, and added Tegretol (Tr. 392). Dr. Bamashmus also noted that the plaintiff "has anger issues, tendency to get into a rage . . . has thoughts of trying to hurt people for the last five years" (Tr. 391).

In a followup appointment on July 20, 2012, Dr. Martin found that the plaintiff's motor and sensory examination was normal. Dr. Martin noted minimal tenderness to palpation along the plaintiff's lumbar spine, but that the plaintiff walked with a normal gait.

Dr. Martin refilled the plaintiff's Soma and Mobic and asked him to return in three months (Tr. 382).

A September 12, 2012, left shoulder x-ray showed no fracture, dislocation, or degenerative joint disease. There was no mention of acromioclavicular joint dysfunction. Thomas M. Doud, M.D., who interpreted the x-ray, noted the left humeral head was mildly "high riding" and that could possibly indicate rotator cuff pathology (Tr. 395).

On September 17, 2012, consultative examiner David G. Cannon, Ph.D., performed a psychological evaluation on the plaintiff and noted that the plaintiff remarked that his biological mother had suffered from bipolar disorder. The plaintiff told Dr. Cannon that Klonopin, Tegretol, and Paxil helped with his symptoms. He stated that he had cut his wrists within the last couple of days prior to this interview and displayed what appeared to be superficial cuts on his wrists. He acknowledged that he has cut himself before and has on one occasion taken an overdose of some type of medication. Dr. Cannon noted that the plaintiff told him that he had not been hospitalized at these times." (Tr. 398). The plaintiff reported experiencing depression, social isolation, and a sad mood; he did not present a clear history of symptoms of bipolar disorder (*id.*). He stated that he disliked being around other people and experienced constant anxiety. He reported constant depression characterized by occasional suicidal ideation (Tr. 399). Dr. Cannon noted that the plaintiff may be exaggerating his symptoms to some extent. Dr. Cannon opined that the plaintiff should be able to manage funds effectively; carry out social and daily self-care activities independently; and maintain concentration and pace sufficiently to complete tasks in a timely manner in a work environment (*id.*).

Dr. Cannon further reported that the plaintiff was able to perform serial 3's effectively (Tr. 399). Dr. Cannon also noted that the plaintiff had a driver's license, prepared meals, and was able to manage money and make change effectively (*id.*). Dr. Cannon diagnosed depressive and anxiety disorder and borderline personality disorder, but

10

found that the plaintiff should be able to carry out sustained social and daily self-care activities independently and to maintain concentration and pace sufficiently to complete tasks in a timely fashion in a work environment (*id*.).

On October 1, 2012, Dr. Bamashmus completed a checklist on which he indicated that the plaintiff's mood was angry; his affect was broad; his thoughts were normal; he had no suicidal or homicidal ideation; he was fully oriented; his memory was normal; his judgment and insight were mildly impaired; his appetite and sleep were normal; he had no symptoms of paranoia, and his attention and concentration were fair (Tr. 404). The plaintiff told Dr. Bamashmus that he had been turned down for Social Security disability (Tr. 403). On October 11, 2012, Dr. Bamashmus gave the plaintiff a note indicating that he was unable to work at this time (Tr. 402).

On October 11, 2012, the plaintiff informed Dr. Martin that overall he felt worse since his last appointment in July and that he was trying to obtain disability benefits. He complained of axial spinal pain with some radiation down his right leg (Tr. 409). On examination, Dr. Martin found minimal tenderness to palpation along the plaintiff's lumbar spine and a normal motor and sensory examination; the plaintiff walked with a normal gait. Dr. Martin refilled Mobic and Soma, started Lortab, and suggested that the plaintiff return in two months (*id*.).

During the plaintiff's December 3, 2012, followup appointment with Dr. Martin, Dr. Martin noted that the plaintiff had pain when transitioning from a flexed position to an upright position. He denied any radiating pain. The plaintiff complained of mild tenderness to palpation in the midlumbosacral junction area. He was able to heel and toe walk; he had no atrophy; and he had full range of motion of his shoulders, elbows, wrists, and fingers. His grip strength was satisfactory bilaterally, and he had good resistive strength in abduction of both shoulders. He was able to bend forward to 50 degrees and he could bend to both sides (Tr. 407).

On February 4, 2013, the plaintiff returned complaining that his back pain was worse and his medication was insufficient. On examination, Dr. Martin found no muscle spasms. The plaintiff was able to bend forward and backwards and to the side and to heel and toe walk. The plaintiff had no radicular symptoms and no palpable muscle spasm. Dr. Martin renewed the plaintiff's prescriptions (Tr. 424-25).

On February 18, 2013, Dr. Bamashmus described the plaintiff as sad. The plaintiff only had fair attention and concentration (Tr. 476). On April 15, 2013, the plaintiff was described as sad and agitated (Tr. 475). In these appointments with the plaintiff, the doctor always noted that he had intact cognition, normal thought processes and normal memory. His judgment and insight were usually noted as intact. On October 15, 2013, Dr. Bamashmus prescribed Viibryd (Tr. 472). On February 14, 2014, Dr. Bamashmus stated the plaintiff had a congruent affect (Tr. 471). The plaintiff did not have any suicidal ideation at these appointments (Tr. 470-76).

On April 2, 2013, the plaintiff reported to Dr. Martin that he was still in the process of an application for disability under Social Security. The plaintiff complained of shoulder pain, but on examination, Dr. Martin found that the plaintiff had a good range of motion of his shoulders, elbows, wrists, and fingers. The plaintiff had no palpable muscle spasms. Dr. Martin renewed the plaintiff's Soma for his complaint of muscle spasm and Lortab for pain (Tr. 422).

On May 29, 2013, Dr. Martin observed that the plaintiff walked without a limp and sat without discomfort (Tr. 420). He transitioned well from seated to standing. On examination, the plaintiff had tenderness to palpation in the paraspinous lumbosacral junction region, but no palpable muscle spasms. He was able to bend forwards, backwards, and to the side, and was able to initiate heel and toe walking. Dr. Martin renewed the plaintiff's medications (*id*.).

12

On August 22, 2013, the plaintiff had full lumbar flexion and extension while seated (Tr. 418). The plaintiff requested a referral to Carol Burnette, M.D., for evaluation on the advice of his lawyer, who was assisting him with his application for Social Security Disability. Dr. Martin complied with the plaintiff's request (*id*.). Dr. Burnette saw the plaintiff initially at Piedmont Comprehensive Pain Management on January 6, 2014 (Tr. 427-30). Dr. Burnette observed that the plaintiff's gait pattern appeared normal although he complained of pain on heel and toe walking. The plaintiff did not appear to be in distress, and his back did not have heat or swelling. No radicular symptoms were noted (Tr. 428). Dr. Burnette noted that the plaintiff's flexion was 50 degrees. The left straight leg raise test was negative and the right was positive for reproducing back pain only. Dr. Burnette found that the plaintiff's lower extremities showed no peripheral edema or focal synovitis. He had no knee effusion and only minimal crepitus. Dr. Burnette further noted that the plaintiff showed a "slightly prominent scapula posteriorly with slight degree of winging at rest, which does not change much with motion of the shoulders and slightly increased kyphotic posture in the upper back." There was slightly increased muscle tension along the paraspinal muscles bilaterally and some tenderness between the shoulder blades and along the mid to lower spine. The plaintiff's shoulder range of motion was within functional limits with some pulling discomfort noted at the end ranges of motion. Upon examination of the plaintiff's hands and wrists, Dr. Burnette noted healed scars on from previous carpal tunnel surgery and that the plaintiff's handgrip appeared strong bilaterally. He had full wrist, hand, and thumb range of motion (Tr. 429).

Dr. Burnette's assessment was increased chronic back and multiple joint pain with intermittent sciatica and history of degenerative spine disease; possible underlying osteoarthritis with left greater than right shoulder and right greater than left knee pain; chronic carpal tunnel syndrome, status post carpal tunnel release years ago; intermittent neck pain; history of bipolar depression and anxiety; and chronic insomnia (Tr. 429).

13

Dr. Burnette suggested a trial of Gabapentin, renewed Soma for muscle spasm and Hydrocodone for pain, and indicated that the plaintiff would have some difficulties related to his musculoskeletal complaints in terms of being able to maintain full-time work without excessive absences. She further noted that the plaintiff had anxiety and depression, "which complicate his situation, as well as chronic insomnia" (Tr. 430).

On March 4, 2014, upon follow-up with Dr. Burnette, she found the plaintiff to be about the same.  Dr. Burnette noted that the plaintiff has a "slightly antalgic gait pattern and slightly more difficulty with right than left healing walking and toe walking.  Exam of the cervical, thoracic, and lumbar spine shows no acute change from last visit.  He remains a little tender at the base of the neck and interscapular region as well as the lower lumbosacral region and SI joints."  His neurologic examination appeared stable. Dr. Burnette increased the plaintiff's Gabapentin and renewed Hydrocodone and Soma (Tr. 452).

On March 25, 2014, Dr. Burnette completed a form indicating that the plaintiff could not perform sedentary work (Tr. 443).  When asked to provide findings that supported this limitation, Dr. Burnette indicated: a lumbar spine MRI of May 19, 2011, that showed disc bulging, and records indicating a history of bilateral carpal tunnel surgery (*id*.).  Dr. Burnette further indicated that the plaintiff's pain would be distracting and that side effects of medication could be expected, but would be only mildly troublesome (Tr. 444).

On the same day, Dr. Burnette completed another form indicating that the plaintiff retained the capacity to lift 20 pounds occasionally, ten pounds frequently, could stand for a total of two hours a day, for 30 minutes without interruption, and sit for a total of four hours, for 45 minutes at a time without interruption (Tr. 447-48).  Dr. Burnette indicated that the plaintiff was capable of low-stress jobs (Tr. 450).  She also indicated that the plaintiff should only occasionally reach, handle, feel, and push/pull, infrequently climb, balance, stoop, and kneel, and crawl and have limited exposure to environmental work

conditions such as moving machinery, temperature extremes, chemicals, dust, and noise. Dr. Burnette opined that the plaintiff would miss more than four days of work per month and would need to elevate his legs and rest in a reclining chair twice a day for one hour each time (Tr. 446-49).

On April 9, 2014, Dr. Bamashmus rated the plaintiff as having marked limitation in activities of daily living, social functioning, and concentration, persistence or pace, and three episodes of decompensation of extended duration.  Under the "C" criteria, Dr. Bamashmus opined that the plaintiff showed inability to function outside of a highly structured, highly supportive living arrangement and a complete inability to function outside the home (Tr. 468).  Dr. Bamashmus indicated that because of bipolar disorder, borderline personality disorder, and social phobia, the plaintiff would have difficulty making occupational, performance, and social adjustments, which, in his opinion, prevented gainful employment (Tr. 454-69).

The plaintiff's aunt, Nellie Lawless, completed a function report in March 2014 in which she stated that she assisted the plaintiff in daily household chores such as laundry and yard work due to the plaintiff's back pain (Tr. 334-35).  Ms. Lawless also stated that the plaintiff does not attend family functions or any other social events due to his anxiety(Tr. 336-37).

### Administrative Hearing Testimony

The plaintiff testified that he cries a lot and recently awoke from a "blackout" to find himself holding a knife to the throat of a relative (Tr. 109).  He testified that he has one or two anxiety attacks per month (Tr. 112).  He further testified that his back and shoulder pain level has reached 8/10 but at best is a 4/10 to 5/10 with pain medication (Tr. 113).  He noted he is in constant pain and most days remains in the bed as this is the only way he seems to be able to relieve his back pain (Tr. 114-15).

The plaintiff testified that due to his condition he is unable to enjoy the normal father-son activities that fathers enjoy.  He has not been to any of his son's sports-related activities due his pain (Tr. 117).  He goes to the grocery store once per month and relies on family members to assist him with daily activities such as cleaning and laundry (Tr.116).

The ALJ asked the vocational expert whether work existed for a hypothetical individual of the plaintiff's age, education, and prior work experience, who was restricted to light work activity and required a sit/stand option (Tr. 119-20).  The ALJ further limited the hypothetical individual to no climbing ladders, ropes, or scaffolds; only occasional balancing, stooping, kneeling, crouching, and crawling; and frequent, but not constant, use of the upper extremities for gross or fine manipulation (Tr. 120).  The ALJ also instructed the vocational expert to consider that the individual was limited to performing simple, routine, repetitive tasks in a low-stress work environment with only occasional changes in the work setting and decision-making, and no ongoing public contact (Tr. 120).

The vocational expert responded that jobs existed in the national economy for such an individual including the job of pricing tagger (light and unskilled); inspector and hand packager (light, unskilled); and finisher (light and unskilled) (Tr. 120-21).  The vocational expert also identified the job of final assembler (sedentary, unskilled) (Tr. 122).  The vocational expert testified that based on his experience the sit/stand option would reduce by 30 percent the numbers of jobs that he had identified (Tr. 120-21)

## ANALYSIS

The plaintiff argues: (1) the ALJ[5] erred in failing to find that his shoulder and knee pain were severe impairments; (2) the ALJ erred by rejecting the opinions of his treating medical sources, (3) the ALJ conducted a deficient credibility assessment with respect to his pain, (4) the Appeals Council failed to comply with Social Security Ruling

---

[5]  The plaintiff alleges errors by the ALJ in the findings that were adopted without alteration or comment by the Appeals Council (Tr. 4-7).

("SSR") 96-7p in assigning little weight to the witness statement from his aunt, and (5) the ALJ erred when he ignored the vocational expert's testimony that there is no work that he could perform upon a proper consideration of his limitations (pl. brief 1-2).

### Severe Impairment

The plaintiff argues that the ALJ erred in finding that his shoulder pain and knee pain were not severe impairments (pl. brief 26-27). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).  Pursuant to SSR 96-03p, "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."  1996 WL 374181, at *1.

The ALJ specifically considered the plaintiff's shoulder pain and limitation and found that it was not a severe impairment (Tr. 25).  Specifically, the ALJ  correctly noted that a September 2012 shoulder x-ray showed no fracture, dislocation, or degenerative joint disease (Tr. 25; *see* Tr. 395). The ALJ further noted that Dr. Martin found that the plaintiff had excellent range of motion of both shoulders on examination on April 25, 2012, and again on December 3, 2012 (Tr. 25; *see* Tr. 385, 407). Dr. Burnette found that the plaintiff's range of shoulder motion was within functional limits (Tr. 429). Moreover, the plaintiff had full 5/5 muscle strength in both upper extremities, which did not support his allegation of a severe shoulder impairment (Tr. 25).  Based upon the foregoing, the ALJ did not err in finding the plaintiff's shoulder pain was not a severe impairment.  Furthermore, the ALJ specifically considered the plaintiff's non-severe shoulder limitations in the residual functional capacity ("RFC") assessment in limiting the plaintiff to lifting and carrying 20 pounds occasionally and ten pounds frequently (Tr. 29).  Accordingly, any error in failing to find the shoulder impairment to be severe is harmless. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (holding that there is "no reversible error where the ALJ

does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps").

The ALJ also specifically considered the plaintiff's knee issues and found that the plaintiff did not have a severe knee impairment (Tr. 25). The ALJ noted that Dr. Martin noted no abnormality in either knee; the patellar reflexes were normal, and there was no range of motion limitation in either knee (Tr. 25; *see* Tr. 385). Dr. Martin consistently found the plaintiff to have a normal, non-antalgic gait (Tr. 25; *see* Tr. 382, 409, 420, 424). Moreover, Dr. Burnette found no knee effusion, only minimal crepitus, and a normal, nonantalgic gait (Tr. 25; *see* Tr. 429). The ALJ further noted that, at the hearing, the plaintiff testified that he has not had any knee surgery, and he merely stated that his right knee comfort was worse than his left (Tr. 25; *see* Tr. 106-107). Based upon the foregoing, substantial evidence supports the ALJ's finding that the plaintiff did not have a severe knee impairment.

### Treating Medical Sources

The plaintiff next argues that the ALJ erred in his consideration of the opinions of Drs. Meyers, Bamashmus, and Burnette and Ms. Dillon (pl. brief 9-16). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

18

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### Dr. Meyers

During an appointment on August 2, 2011, Dr. Meyers noted that the plaintiff had received a summons from family court and complained that he had a really bad month, could not work because of his nerves and back, he could not stand noise, and he got angry very easily (Tr. 371). Dr. Meyers wrote a note stating that the plaintiff had been under his care since 2008, the plaintiff suffered from generalized anxiety that was not well controlled, the plaintiff was becoming agoraphobic as a result, and the plaintiff was not "currently able to work and has difficulty even caring for himself." Dr. Meyers further stated that the plaintiff was awaiting formal psychiatric evaluation (Tr. 373).

The ALJ considered Dr. Meyers' opinion in evaluating the plaintiff's musculoskeletal pain and gave it no weight (Tr. 29-30). Specifically, the ALJ noted that the statement was made prior to the period at issue in this case, where disability was alleged

only since March 8, 2012.  Further, the statement was not corroborated by exam findings, tests, imaging, or other support.  Lastly, Dr. Meyers did not explain why he thought the plaintiff was unable to work.  The ALJ noted that the Dr. Meyers could mean that the plaintiff could not do his past work or could not do any work (Tr. 29-30).  As noted above, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions, but are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.  Furthermore, the evidence with which an opinion is supported is a proper consideration in assessing the opinion of a treating physician.  20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5).

The ALJ also considered Dr. Meyers' opinion in evaluating the plaintiff's mental impairments and gave it "very little weight" (Tr. 33-34).  The ALJ noted that the opinion that the plaintiff was unable to work or even care for himself due to generalized anxiety disorder and incipient agoraphobia was at odds with Dr. Meyers' treatment notes, which indicated in January 2012 that the plaintiff was not visibly anxious, in April 2012 was "doing really well," and in July 2012 was alert, pleasant, and cooperative with normal cognition (Tr. 34; *see* Tr. 359-77). The ALJ further noted that the opinion was given significantly prior to the current alleged onset date (Tr. 34). The undersigned finds that the ALJ properly considered Dr. Meyers' opinion and that substantial evidence supports his assessment.

### Ms. Dillon

Ms. Dillon, the plaintiff's physical therapist, completed a form on June 18, 2012, after nine physical therapy visits during a one month period.  Ms. Dillon indicated that the plaintiff's symptoms were "very frequently" severe enough to interfere with the attention and concentration required to perform simple work-related tasks; he would need to recline or lie down in excess of the typical breaks allowed in an eight-hour workday; he could stand/walk a total of only two hours in an eight-hour workday and only ten minutes at one

time; he could sit a total of only three to four hours in an eight-hour workday and only 15 minutes at one time; he would need to take unscheduled breaks within every few minutes during an eight-hour workday, and these breaks would vary, taking as long as 20 minutes or more; he could occasionally lift less than ten pounds; he could grasp, turn, and twist objects 90 percent of the workday with either hand, use his fingers for fine manipulation with either hand 90 percent of the workday, and use his arms for 50% of a workday; his grip strength was 70 pounds with his right hand and 62 pounds with his left hand; and he would be absent from work as a result of his impairments or treatments more than four times a month (Tr. 357-58).

The ALJ considered Ms. Dillon's opinion and afforded it little weight (Tr. 30). Specifically, he noted that Ms. Dillon had only seen the plaintiff for one month prior to giving her opinion, and she did not explain on what information she based her answers.  Further, Ms. Dillon "gave no specifics, examples, or test results to back up her bald assertions about the claimant's ability to sit, stand or walk . . . or why he cannot do work on full-time basis." The ALJ also noted that the only precise support Ms. Dillon gave was bilateral grip strength of between 62 and 70 pounds, while she stated that normal grip strength for a person the plaintiff's age would be about 112-119 pounds.  The ALJ stated that the results were "completely at odds with the results garnered by Dr. Martin and Dr. Burnette, who both found the claimant to have normal (to excellent) grip strength" (Tr. 30; *see* Tr. 385, 407, 429).  Moreover, the plaintiff testified that the carpal tunnel release surgery helped his carpal tunnel syndrome very much (Tr. 30; *see* Tr. 107-108).

A physical therapist is not an "acceptable medical source," but rather is considered an "other source" under the regulations. 20 C.F.R. §§ 404.1513(d), 416.913(d) ("In addition to evidence from the acceptable medical sources ... we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include ... therapists).  The weight to be given to evidence from other

21

sources "will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors . . . ." SSR 06-03p, 2006 WL 2329939, at *4. "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight." *Id.* at *2. The ALJ "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. The length of the treatment relationship and the frequency of the examinations and the evidence with which the opinion was supported are proper considerations by the ALJ. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). Here, the ALJ adequately explained the weight give to the opinion of Ms. Dillon, and his assessment is supported by substantial evidence.

### Dr. Burnette

On March 25, 2014, the plaintiff's treating pain management specialist, Dr. Burnette, reported that the plaintiff could frequently lift ten pounds and occasionally lift 20 pounds; could stand/walk a total of only two hours in an eight-hour workday and only 30 minutes without interruption; could sit a total of only four hours in an eight-hour workday and only 45 minutes without interruption; would need to occasionally elevate his legs at least to waist height during an eight hour workday due to pain; could rarely climb, balance, stoop, kneel, or crawl; and could only occasionally reach, handle, feel, or push/pull. Dr. Burnette reported that the plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work; pain would cause a moderately severe interference with the ability of the plaintiff to maintain concentration throughout an eight-hour workday; pain would require the plaintiff to exceed the number of usual breaks during an eight-hour workday; and the plaintiff was likely to be absent from work more than

four days per month as result of his impairments or treatment. In response to a set of interrogatories, Dr. Burnette reported that the plaintiff was not capable of full-time work, even at a sedentary level (Tr. 443-50).

The ALJ evaluated Dr. Burnette's opinion using the factors set out above and ultimately gave the opinion little weight (Tr. 30-31).  *See* 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5).  Specifically, with respect to the regulatory factor of the length of the treatment relationship, the ALJ noted that the plaintiff had only been a patient of Dr. Burnette's for three months when she completed the form (Tr. 31). With respect to the factor of the degree to which Dr. Burnette's opinion was supported by the evidence, the ALJ noted that in assessing sitting, standing, walking, reaching, stooping limitations on the Medical Source Statement supplied by the plaintiff's attorney, Dr. Burnette did not support her conclusions with medical findings, but merely enumerated the plaintiff's diagnoses and subjective complaints (Tr. 31; *see* Tr. 448-50). The ALJ noted that Dr. Burnette did not rely on any evidence of imaging, nerve conduction studies, or electromyograms (Tr. 31). The ALJ also considered that Dr. Burnette observed on January 6, 2014, that the plaintiff's gait was essentially normal (Tr. 28; *see* Tr. 428). The ALJ noted that the diagnostic MRI of record did not reveal any neuroforaminal narrowing or spinal cord stenosis, no nerve root impingement, and no spondylolisthesis, and that x-rays did not show any significant loss in vertebral heights (Tr. 31; *see* Tr. 395).  The ALJ noted that Dr. Burnette cited the plaintiff's carpal tunnel release surgery "several years ago" in support of opinion regarding the plaintiff's use of his wrists, hands, and fingers (Tr. 31; *see* Tr. 443).  However, the fact that the plaintiff had surgery provided no support regarding his limitations during the time Dr. Burnette treated him, the plaintiff stated himself that the surgery greatly alleviated his symptoms, and Dr. Burnette described the plaintiff's bilateral grip strength as strong in her notes  (Tr. 31; *see* Tr. 429). Here, the ALJ articulated valid reasons for not giving significant

23

weight to Dr. Burnette's opinion and complied with the relevant regulations in giving little weight to this opinion.

### Dr. Bamashmus

In a visit note dated October 1, 2012, Dr. Bamashmus, the plaintiff's treating psychiatrist, noted the plaintiff is "nonfunctional because of poor impulse control, depression, and anxiety" (Tr. 404). On October 11, 2012, Dr. Bamashmus completed a letter stating, "Mr. Gibson is a patient under my care. He is not able to work at this time and he has applied for disability benefits" (Tr. 402). In a visit note dated November 26, 2012, Dr. Bamashmus reported, "It is my opinion that he is unable of gainful employment because of depression, anxiety and anger" (Tr. 403). On April 9, 2014, Dr. Bamashmus stated that the plaintiff would never be able to: deal with the public; deal with work stresses; behave in an emotionally stable manner; or relate predictably in social situations. He reported that the plaintiff would rarely be able to: follow work rules; relate to co-workers; use judgment; interact with supervisors; understand, remember and carry out simple job instructions; maintain personal appearance; or demonstrate reliability. Dr. Bamashmus noted the plaintiff could only occasionally function independently or maintain attention/concentration. He opined that the plaintiff's mental impairments would require him to exceed the number of usual breaks during an eight-hour workday and would interfere with the completion of an eight-hour workday. When asked how many days per month the plaintiff would be absent from work, Dr. Bamashmus responded "unable of gainful employment" (Tr. 454-56). In the Psychiatric Review Technique, Dr. Bamashmus reported that the plaintiff's mental impairments meet Listing 12.04 (Affective Disorders), Listing 12.05 (Anxiety-Related Disorders), and Listing 12.08 (Personality Disorders) (Tr. 457-69).

In evaluating the functional limitations from the plaintiff's mental impairments, the ALJ considered that Dr. Bamashmus in July 2012 observed that the plaintiff had a broad affect, could attend and concentrate, and had an intact recent and remote memory

24

(Tr. 32; *see* Tr. 390). The ALJ noted that in several appointments with the plaintiff, Dr. Bamashmus indicated that the plaintiff had intact cognition, normal thought processes, normal memory, and that his judgment and insight were intact (Tr. 32; *see* Tr. 391, 404, 471-76). The ALJ found that in the October 11, 2012, statement, Dr. Bamashmus provided no support of any symptoms, signs, testing, or evaluations to support the "bald assertion" that the plaintiff was "not able to work at this time." Accordingly, he gave the opinion no weight (Tr. 32). As noted above, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions, but are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5. Furthermore, the evidence with which a physician supports his opinion is a proper consideration in assessing the opinion of a treating physician. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5).

The ALJ further explained that he gave little weight to Dr. Bamashmus' opinion that the plaintiff was unable to function outside of a highly structured and supportive living arrangement (Tr. 468), because the form portrayed the plaintiff as much more limited than Dr. Bamashmus' treatment notes and nothing in those notes depicted the plaintiff as having significant limitation in activities of daily living (Tr. 32; *see* Tr. 381, 404, 471-76). Dr. Bamashmus usually noted the plaintiff to have intact cognition, normal thought process, normal memory, and intact judgment and insight. Further, the plaintiff never had any suicidal ideation in his visits with Dr. Bamashmus (Tr. 32; *see* Tr. 471-76). The record shows that the plaintiff was living independently, drove a car, grocery shopped, prepared simple meals, visited with his son and his aunts, attended medical appointments, and paid his own bills (Tr. 111, 115-16, 366, 399). Moreover, the ALJ noted that Dr. Cannon found, after examining the plaintiff, that he should be able to carry out social and daily self-care activities in an independent and sustained fashion and to maintain concentration and pace sufficiently to complete tasks in a timely manner in a work environment (Tr. 33; *see* Tr. 399). The ALJ also noted that Dr. Bamashmus rated the plaintiff as having "marked"

25

limitations in concentration, persistence, or pace, which was inconsistent with the notes on examination checklists indicating that the plaintiff was able to concentrate (Tr. 32; *see* Tr. 471-76). Moreover, the ALJ considered Dr. Bamashmus' opinion that the plaintiff would never be able to deal with the public or typical work stresses and would rarely be able to follow work rules, relate to co-workers and supervisors, and use judgment on the job (Tr. 32-33). The ALJ noted that this opinion was inconsistent with Dr. Bamashmus' office notes, which usually characterized the plaintiff's judgment as intact and, at most, mildly impaired (Tr. 471-76). The ALJ's assessment of Dr. Bamashmus' opinions is consistent with the guidance provided in the regulations regarding the requirement that a physician's opinion must be supported by and consistent with other evidence in the record. 20 C.F.R. §§ 404.1527(c)(3),(4), 416.927(c)(3),(4)). Therefore, the ALJ complied with the regulations when he articulated valid reasons for discounting Dr. Bamashmus's extreme limitations, and substantial evidence supports the ALJ's assessment.

Based upon the foregoing, this allegation of error is without merit.

### *Credibility*

The plaintiff further alleges that the ALJ improperly evaluated the credibility of his subjective complaints (pl. brief 18-23). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about

the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The plaintiff specifically argues that the ALJ erred by requiring objective medical evidence of the severity of his pain (pl. brief 20-22).  The undersigned disagrees. The ALJ found that the plaintiff's impairments could be expected to cause some of the alleged symptoms, but that the plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible (Tr. 28).  For example, the ALJ noted that the MRI showed no neurological impingement, that Dr. Martin found no tenderness in the lumbar spine, that the plaintiff's lower extremity muscle strength was excellent at 5/5 in both legs, that the plaintiff had no radicular symptoms, and Dr. Martin observed that the plaintiff sat without discomfort and transitioned well from a seated to a standing position, which was contrary to the plaintiff's testimony that he had constant pain and that almost any exertional activity significantly exacerbated his back pain (Tr. 28; *see* Tr. 420). The ALJ also noted that the plaintiff's gait was normal, his grip strength was strong, and he was able to drive, care for himself, live alone, shop, and prepare meals (Tr. 28).    The ALJ further noted that two of the physicians who examined the plaintiff commented that he may be exaggerating his symptoms (Tr. 36). Dr. Cannon noted that the plaintiff "seemed quite possibly to be exaggerating his symptoms" (Tr. 399), and Dr. Martin also noted on examination that the plaintiff exhibited "exaggerated groaning and moaning" (Tr. 385).  Also, the ALJ noted that the plaintiff told Dr. Martin in April 2012 that he took an occasional Lortab he obtained from a relative and no other pain medication (Tr. 384).  The ALJ found this "very casual, intermittent use of pain medication [was] also inconsistent" with the plaintiff's back pain complaints (Tr. 28) and reflected negatively on the plaintiff's credibility (Tr. 36).

The plaintiff argues that the medical record does not support the ALJ's conjecture that this could indicate drug-seeking behavior (pl. brief 23). To the extent that the ALJ may have improperly relied on such an inference, the error is harmless because the ALJ gave several other reasons for his credibility finding that were supported by substantial evidence. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).  The ALJ has articulated a reasonable basis for finding the plaintiff's subjective complaints not fully credible and lack of objective evidence was only one factor in the ALJ"s analysis, along with the plaintiff's activities of daily living, inconsistencies between his subjective complaints and his presentation to treating sources, types and dosage of medication taken, and evidence that he might be exaggerating his symptoms (Tr. 28, 33, 36). SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").  The plaintiff is essentially asking the court to read the evidence differently, which is not the role of this court. *See Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir.2001) (stating that the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency) (citation omitted).  Based upon the foregoing, the undersigned finds that the ALJ did not err in his credibility determination.

**Witness Statement**

The plaintiff next argues that the Appeals Council failed to properly consider a report from his aunt (pl. brief 24-26).  Ms. Lawless completed a Third Party Function Report, providing her observations of the plaintiff's impairments and resulting limitations (Tr. 332-39). The ALJ did not mention Ms. Lawless' report in the decision.  However, the

Appeals Council granted the plaintiff's request for review and considered Ms. Lawless' report but gave it "little weight," finding as follows:

> We have taken into consideration that (1) the claimant's aunt is not a medical expert, (2) the opinions of the claimant's aunt are largely based on the claimant's subjective complaints, and (3) although the claimant's aunt indicate that the claimant's condition affects certain functions such as lifting, reaching, walking, standing and sitting, she did not indicate the degree of such limitation.

(Tr. 5).

The plaintiff argues that the Appeals Council's rational for "disregarding Ms. Lawless's report - on the basis that she is not a medical professional - is flawed" (pl. brief 25). The plaintiff notes that his aunt does not need to be a physician to offer her observations as to how his pain and mental impairments affect his daily life. The regulations provide that, in assessing a claimant's RFC, an ALJ should consider "descriptions and observations" of a claimant's limitations from his impairments that are provided by the claimant as well as the claimant's "family, neighbors, friends, or other persons." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). An ALJ "may" use evidence from other non-medical sources, such as testimony from spouses, parents, and friends, to show the severity of a claimant's impairment(s) and how it affects the ability to work. *Id.* §§ 404.1513(d)(4), 416.913(d)(4). In assessing the credibility of a claimant's statements, the ALJ must consider the entire case record, including "statements . . . provided by . . . other persons about the symptoms and how they affect the individual . . . ." SSR 96-3p, 1996 WL 374186, at *1.

While the undersigned agrees that Ms. Lawless does not need to be a medical expert to provide testimony, the regulations do differentiate among sources of evidence. *See* 20 C.F.R. §§ 404.1513(c),(d), 416.913(c),(d) (discussing "acceptable medical sources," "other medical sources," and "other non-medical sources"). For instance, the weight to be given to evidence from other sources "will vary according to the particular facts

31

of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors . . . ."  SSR 06-03p, 2006 WL 2329939, at *4. "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight." *Id.* at *2.  Accordingly, the undersigned finds no error in the Appeals Council's acknowledgment that Ms. Lawless was not a medical expert.

In considering evidence from "non-medical sources" such as spouses, parents, friends, and neighbors, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–03p, 2006 WL 2329939, at *5-6.  Accordingly, the undersigned sees no error in the Appeals Council's decision to discount Ms. Lawless' opinion because it was "largely based on the claimant's subjective complaints" and was not specific as to the degree of the plaintiff's limitations (Tr. 5) as these are appropriate factors for consideration.

### Residual Functional Capacity

Overall, the undersigned finds that the ALJ's RFC assessment is based upon substantial evidence.  In evaluating the plaintiff's RFC, the ALJ accommodated the limitations from the plaintiff's anxiety, depression, and bipolar disorder by limiting him to the simple, routine, repetitive tasks of unskilled work in a low-stress environment that did not require ongoing public contact, and involved only occasional changes in the work setting and occasional decision making.  Further, the ALJ accommodated the limitations from the plaintiff's lumbar degenerative disk disease, bilateral carpal tunnel syndrome, and shoulder pain by limiting him to light work with the need to alternate sitting and standing throughout the work day; no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and frequent gross and fine manipulation (Tr. 27).

In the RFC assessment, the ALJ considered that the plaintiff's diagnostic testing did not indicate a disabling back impairment. The ALJ noted that Dr. Martin reviewed the plaintiff's lumbar MRI that showed only disc bulges at L4-5 and L5-S1, with no herniation, and no neuroforaminal or spinal cord stenosis (Tr. 28; *see* Tr. 385). The ALJ also considered that a September 12, 2012, x-ray showed no loss in vertebral height (Tr. 28). The ALJ further considered that Dr. Martin's clinical examination findings did not indicate a disabling lumbar impairment (Tr. 28). On April 25, 2012, Dr. Martin found that the plaintiff's extremity muscle strength was 5/5 in both legs, and that he demonstrated no lower extremity sensory deficits or abnormal deep tendon reflexes (Tr. 28 *see* Tr. 382, 385). The plaintiff was pain-free on internal/external rotation of his hips, and his test of straight leg-raising was negative for radicular symptoms (Tr. 385). The ALJ considered that on August 22, 2013, the plaintiff had full lumbar extension and flexion (Tr. 28). The ALJ also noted that the plaintiff reported no radicular symptoms on February 4, 2013, and no palpable muscle spasm (Tr. 28; *see* Tr. 424). Therefore, the ALJ reasonably found that Dr. Martin's diagnostic and clinical findings were consistent with the exertion involved in light work that provided an opportunity to change from standing to seated positions while working (Tr. 29).

The ALJ also gave great weight to the consultative psychological examination of the plaintiff by Dr. Cannon in September 2012 (Tr. 33; *see* Tr. 398-400). Dr. Cannon found that the plaintiff's depressive and anxiety disorder should not prevent him from the ability to carry out sustained social and daily self-care activities independently and to maintain concentration and pace sufficiently to complete tasks in a timely fashion in a work environment (Tr. 399).

Based upon the foregoing, the ALJ's assessment of the plaintiff's RFC is based upon substantial evidence.

***Vocational Expert Testimony***

Lastly, the plaintiff argues that the ALJ "ignored the testimony of the vocational expert that there is no work that [the plaintiff] can perform upon a proper consideration of all of [his] limitations" (pl. brief 27). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). The plaintiff argues that when the mental and physical limitations described by his treating physicians were included, the vocational expert testified that no jobs would be available (see Tr. 122). As discussed throughout this report, the RFC assessment by the ALJ was based upon substantial evidence, and, in response to a proper hypothetical, the vocational expert testified that jobs existed in the national economy for such an individual (Tr. 119-21). *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (finding that substantial evidence supported the ALJ's decision that the plaintiff was not disabled where the hypothetical to the vocational expert included all limitations that were supported by the record as a whole). Accordingly, if the record does not support the existence or extent of a limitation, the ALJ need not include it in the hypothetical question. *See Lee v. Sullivan*, 945 F.2d 687, 693 (4th Cir.1991) (noting that a requirement introduced by claimant's counsel in a question to the vocational expert "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record"). Based upon the foregoing, this allegation of error is without merit.

## <u>CONCLUSION AND RECOMMENDATION</u>

The Commissioner's decision is based upon substantial evidence and is free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


s/ Kevin F. McDonald
United States Magistrate Judge

January 28, 2016
Greenville, South Carolina